LAW OFFICES 126 KIRK        5633238335           12/07/05  11:17am  P. 001

      EXHIBIT B      

*FILED*

05 DEC -5 AM 10: 18

CLERK OF DISTRICT COURT
SCOTT COUNTY, IOWA

## IOWA DISTRICT COURT IN AND FOR SCOTT COUNTY

|  |  |
|---|---|
| JEFFREY VARBONCOEUR, an Iowa resident, LYDIA VARBONCOEUR, an Iowa resident, LUIS R. RIOS, an Iowa resident, and LIOVIGILDA R. RIOS, an Iowa resident, on behalf of themselves and all others similarly situated, | Case No. 103048 |
| Plaintiffs, | **FIRST AMENDMENT TO CLASS ACTION PETITION** (Jury Demand Included) |
| vs. | |
| STATE FARM FIRE AND CASUALTY COMPANY, an Illinois corporation. | |
| Defendant. | |

State Farm sold replacement cost value policies but never intended to and did not pay policyholders on a replacement cost value basis. Policyholders without claims deserve their money back. Policyholders with claims deserve full replacement cost value. State Farm used euphemisms (such as "payable when incurred", "incurred items" and/or "depreciation") to avoid paying policyholders the full replacement cost value. That's wrong.

### Division I

Division I includes paragraphs 1 through 67, et. al,. of the Class Action Petition which seeks remedies for underpayment by State Farm of first party structural dwelling loss claims and inflated premiums. Such paragraphs are not deleted or altered by the allegations contained in Division II below.

### Division II

Division II of the First Amendment to Class Action Petition seeks remedies for underpayment by State Farm of first party structural dwelling loss claims and wrongfully collected premiums. Under Division II, Luis R. Rios and Liovigilda R. Rios, on behalf of themselves and all others similarly situated (collectively "named plaintiffs"), for their First Amendment to Class Action Petition against defendant State Farm Fire and Casualty Company ("State Farm" or "defendant"), state as follows:

## NATURE OF ACTION

1.      State Farm issues replacement cost value homeowner's insurance policies to its policyholders, the putative class members. As a matter of practice, after a claim is submitted, State Farm calculates the total "Replacement Cost Value" (or other substantially similar designation) of the damaged property. State Farm issues a loss estimate to the policyholder which segregates the total "Replacement Cost Value" into (among other things) the "Payable When Incurred", "incurred items" and/or "Depreciation" portion (jointly hereafter referred to as "D/PWI"). As an alternative to or in addition to allocating a "Payable When Incurred" or "incurred items" portion, State Farm may allocate a "Depreciation" portion. State Farm quickly issues a less than replacement cost value check to the policyholder for the amount of the "Net Actual Cash Value Payment" portion as generally shown on the loss estimate which is LESS the deductible shown on the Declarations Page.

2.      State Farm takes the position with its policyholders that State Farm will essentially **reimburse** its policyholders for amounts spent by the policyholder once repair or replacement of the damaged part of the property is completed, but only up to the D/PWI as already determined by State Farm and/or the applicable limit of liability shown

2

in the Declarations (which rarely occurs), whichever is less. If a policyholder does not repair or replace the damaged part of the property State Farm retains the full amount of the D/PWI of the total "Replacement Cost Value" (or other substantially similar designation) suffered by the policyholder, and no amount of the D/PWI is paid out as reimbursement, direct payment on the replacement cost or otherwise to the policyholder.

3.      As reflected in Division I, the State Farm homeowner's policies at issue in this Division II include but are not limited to Form FP-7955 as well as any other property and casualty form issued by State Farm with "Loss Settlement" language substantially the same as that reflected in Form FP-7955 (the "Original Policy"). Also as reflected in Division I, at issue in this Division II is the State Farm replacement cost value policy Form FE-5273 as well as any other replacement cost value form issued by State Farm with "Loss Settlement" language substantially the same as is reflected in Form FE-5273 (the "Endorsement") (collectively, the "Policy").

4.      State Farm takes the position that Loss Settlement provisions of the *Original Policy* permit State Farm to segregate a policyholder's "loss" between and among "Actual Cash Value" and/or D/PWI portions, and then to promptly pay a policyholder only the "Actual Cash Value" portion. State Farm also takes the position that the Loss Settlement provisions of the Original Policy permit State Farm to withhold any D/PWI portion of the replacement cost value until the repair or replacement is actually completed and the policyholder requests reimbursement up to the D/PWI portion (or applicable limits), whichever is less. The Original Policy includes language reflecting a two year period from the date of the loss for the policyholder to complete repairs or

3

replacement. If the D/PWI portion is never claimed, State Farm keeps those funds, even though those funds represent covered losses.

5.     In contrast, the Loss Settlement provisions of the *Endorsement* are strictly "replacement cost value" obligations, with no provision for any allocation between or among "Actual Cash Value" and/or D/PWI portions, let alone any contractual authorization for withholding any funds from policyholders for two years or any amount of time. Knowing this, State Farm continued to treat policyholders as if they had paid premiums for coverage under the Original Policy, rather than for coverage under the Endorsement which policyholders were sold and which was actually in effect.

6.     State Farm's <u>non-replacement</u> cost value loss payment practices violate the terms of the Policy in a fundamental way: under the Endorsement and its Loss Settlement provisions, State Farm may not segregate the "Replacement Cost Value" at all between the "Actual Cash Value" portion and the D/PWI portion, and must pay policyholders the full amount of the "Replacement Cost Value", less the deductible; therefore, the policyholders are entitled to the full amount of the D/PWI portion wrongfully withheld (since the deductible was already taken out of the "Actual Cash Value" portion).

7.     Upon information and belief, State Farm, by segregating the loss as reflected in this First Amendment to Class Action Petition, sought to essentially continue the coverage and claims practices under the Original Policy and apply those coverage and claims practices to the Endorsement, even though the Endorsement's Loss Settlement language was completely different and coverage was touted to policyholders by State Farm as true "replacement cost value" coverage.

4

8.      Upon information and belief, State Farm intended to implement policies and procedures contrary to the terms of the Endorsement, as reflected in this First Amendment to Class Action Petition, before such Endorsements were issued and/or renewed, but continued to represent to policyholders that the Endorsement represented true "replacement cost value" coverage. Before a claim is made under the Endorsement, State Farm does not inform Endorsement policyholders (including Mr. Rios) that they will not receive the full replacement cost value and that D/PWI would be State Farm's excuse to avoid paying what is due. In any event, the Endorsement language (and promised coverage) remained the same even after a claim. Therefore, State Farm fraudulently induced Endorsement policyholders to enter into and/or renew Endorsement policies and pay premiums under the false premise that such Endorsement policyholders would receive true "replacement cost value" coverage. With respect to those policyholders covered by the Endorsement who made no claims for first party dwelling structural losses, such Endorsement policyholders are entitled to disgorgement of premiums (and/or reduction and disgorgement of otherwise inflated premiums reflecting the Endorsement's promised true "replacement cost value" coverage), or disgorgement of State Farm profits associated with the fraudulently induced acceptance or renewal of Endorsement policies and related premiums.

## JURISDICTION AND VENUE

9.      Venue is proper in Scott County, Iowa, under Iowa Code Sections 616.14 and 616.18. State Farm transacts business and may be found within Scott County, Iowa.

10.      State Farm is within the jurisdiction of this Court. State Farm transacts tens of millions of dollars of business in the State of Iowa and operates offices and

5

agencies in Scott County.  Thus, State Farm has obtained the benefits of the laws of the State of Iowa and the Iowa property and casualty insurance markets.

11.    State Farm also transacts tens of millions of dollars of business in each State of the United States of America and operates offices and agencies in all States. Thus, State Farm has obtained the benefits of the laws of each State of the United States of America and their respective property and casualty insurance markets.

12.    The total amount in controversy for each of the named plaintiffs' claims for the amount of the wrongfully withheld D/PWI portion of the replacement cost value (and/or return of all or any portion of inflated premiums), together with *pro rata* interest, attorney's fees and punitive damages for each member of the Classes (as defined below) is less than Seventy-Five Thousand Dollars ($75,000) per individual.

## THE PARTIES

13.    Plaintiffs Luis R. Rios and Liovigilda R. Rios are residents and citizens of the State of Iowa.

14.    State Farm Fire and Casualty Company is an Illinois corporation with its headquarters in Bloomington, Illinois.  State Farm is a corporation transacting tens of millions of dollars of business within the State of Iowa, and tens of millions in each of the States of the United States of America.

15.    The acts charged in this First Amendment to Class Action Petition as having been done by State Farm were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of State Farm's business or affair, acting within the course and scope of their employment.

## GENERAL ALLEGATIONS

6

16.   Plaintiffs Luis R. Rios and Liovigilda R. Rios were named insureds on a homeowner's policy issued by State Farm Fire and Casualty Company, Policy Number 15-32-9979-1 (the "Rios Policy"). Mr. and Mrs. Rios paid the premiums on the Rios Policy for the policy period including May 8, 2003. At all pertinent times Mr. and Mrs. Rios lived at 525 Sierra Drive, Burlington, Iowa. On or about May 8, 2003, a hail-storm swept through Burlington and damaged the Rios home. Mr. and Mrs. Rios made a claim under the Rios Policy (Claim #15-C579-124). On or about June 3, 2003, State Farm "inspected" the Rios home. There was no dispute between State Farm and Mr. and Mrs. Rios that the May 8, 2003 hail-storm caused a "covered loss" under the Rios Policy in some amount. A "certified" copy of the Rios Policy is attached and incorporated as Exhibit "A".

17.   On or about June 11, 2003, State Farm issued to Mr. and Mrs. Rios a first written total "Actual Cash Value" and "Replacement Cost Value" loss estimate of $356.67. After applying the $500 deductible, State Farm's initial loss payment proposal for the "Net Actual Cash Value Payment" was $0.00. State Farm's *first* written loss estimate to the Rios is attached and incorporated as Exhibit "B".

18.   On or about September 25, 2003, State Farm issued a second written loss estimate, reflecting $2,649.89 in "Replacement Cost Value", segregated into $1,109.36 in "Items Payable When Incurred" and $1,540.53 in "Actual Cash Value", resulting in a "Net Actual Cash Value Payment" of $1,040.53 (after subtracting the $500 deductible) and a "Total Amount of Claim If Incurred" of $2,149.89, based upon the June 3, 2003 initial inspection. After subtracting the $500 deductible, State Farm also set forth a "Net

7

Actual Cash Value Payment" of $1,040.53. State Farm's *second* written loss estimate to Mr. and Mrs. Rios is attached and incorporated as Exhibit "C".

19. At the bottom of the first page of both written loss estimates it says in bold capitalized letters: "ALL AMOUNTS PAYABLE ARE SUBJECT TO THE TERMS, CONDITIONS AND LIMITS OF YOUR POLICY."

20. On that same day, September 25, 2003, State Farm issued and sent an unsolicited check to Mr. and Mrs. Rios in the amount of $1,040.53. Mr. and Mrs. Rios cashed the State Farm check.

21. State Farm has never repaired or replaced the damaged part of the Rios property.

22. State Farm has never paid Mr. and Mrs. Rios any of the $1109.36 allocated by State Farm as "Items Payable When Incurred".

23. Mr. and Mrs. Rios have never repaired or replaced the damaged part of the Rios property.

24. Without completing such repairs or replacement and incurring those costs initially, Mr. and Mrs. Rios believed it would be futile to seek reimbursement or direct payment from State Farm for the $1109.36 allocated by State Farm as "Items Payable When Incurred".

25. Mr. and Mrs. Rios had also submitted a claim to State Farm under the Policy based upon destruction to their property occurring on February 22, 2003, caused by the criminal conduct of a man the local police had engaged in a car chase through the Rios property. The damage was to what State Farm categorized as both personal property and the "building" or dwelling. In connection with the adjustment of that claim

(which included a "depreciation" allocation of $44.40) State Farm sent Mr. and Mrs. Rios

a letter, dated March 31, 2003, and a "Property Claim Agreement", which states at the

bottom in bold and bordered print:

> The following applies to Homeowners Policy Form FP-7955: To receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years of the date of loss, and notify us within 30 days after the work has been completed.

26.    State Farm intended that Mr. and Mrs. Rios believe and Mr. and Mrs. Rios

reasonably did believe that they would have at least two years to complete the repairs or

replacement and obtain reimbursement of the $1109.36 in "Items Payable When

Incurred" related to the May 8, 2003 hail-storm damage.

27.    Mr. and Mrs. Rios reasonably relied upon the above representations of

State Farm with respect to outstanding "replacement cost value" loss payments and

coverage terms.

28.    SECTION I-LOSSES INSURED of the Original Policy provides as

follows:

COVERAGE A-DWELLING

> We insure for accidental direct physical loss to the property described in Coverage A, except as provided in SECTION 1-LOSSES NOT INSURED.

(Rios Policy, p. 7).

29.    SECTION I-COVERAGES of the Original Policy provides as follows:

COVERAGE A-DWELLING

> 1.    Dwelling. We cover the dwelling used principally as a private residence on the residence premises shown in the Declarations.

(Rios Policy, p. 3).

30.    The SECTION 1—LOSS SETTLEMENT of the Original Policy provides:

Only the Loss Settlement provisions shown in the Declarations apply. We will settle covered property losses according to the following:

1.      A1-Replacement Cost Loss Settlement-Similar Construction.

a.      We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I—COVERAGES, COVERAGE A-DWELLING, except for wood fences, subject to the following:

(1)     until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property;

(2)     when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less;

(3)     to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of the loss, and notify us within 30 days after the work has been completed; and

(4)     we will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under Option OL-Building Ordinance or Law Coverage.

***

2. A2-Replacement Cost Loss Settlement-Common Construction.

a.      We will pay the cost to repair or replace with common construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I—COVERAGES, COVERAGE A-DWELLING, except for wood fences, subject to the following:

(1)     We will pay only for repair or replacement of the damaged part of the property with common construction techniques and materials commonly used by the building trades in standard new construction. We will not pay the cost to repair or replace obsolete, antique or custom construction with like kind and quality;

(2)     until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to

10

the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property as described in a.(1) above;

(3)     when the repair or replacement is actually completed as described in a.(1) above, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less;

(4)     to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of the loss, and notify us within 30 days after the work has been completed; and

(5)     we will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under Option OL-Building Ordinance or Law Coverage.

***

(Original Policy, pp. 11-12) (Form FP-7955).

31.     The Endorsement in effect at the time of the May 8, 2003 loss,

"COVERAGE A LOSS SETTLEMENT ENDORSEMENT", provides as follows:

SECTION 1-LOSS SETTLEMENT

COVERAGE A-DWELLING (Applicable to HOMEOWNERS POLICY)

**A1-Replacement Cost Loss Settlement-Similar Construction is replaced with the following:**

a.     We will pay up to the applicable limit of liability shown in the Declarations, the reasonable and necessary cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION 1-COVERAGES, COVERAGE A-DWELLING, except for wood fences.

We will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under Option OL-Building Ordinance or Law Coverage.

***

**A2-Replacement Cost Loss Settlement-Common Construction is replaced with the following:**

11

a.      We will pay up to the applicable limit of liability shown in the Declarations, the reasonable and necessary cost to repair or replace with common construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I—COVERAGES, COVERAGE A-DWELLING, except for wood fences, subject to the following:

(1)      We will pay only for repair or replacement of the damaged part of the property with common construction techniques and materials commonly used by the building trades in standard new construction.  We will not pay the cost to repair or replace obsolete, antique or custom construction with like kind and quality;

(2)      We will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under Option OL-Building Ordinance or Law Coverage.

***

SECTION 1-LOSS SETTLEMENT

COVERAGE A-BUILDING PROPERTY (Applicable to CONDOMINIUM UNITHOLDERS POLICY)

**This section is replaced with the following:**

1.      We will pay up to the applicable limit of liability shown in the Declarations, the reasonable and necessary cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I—COVERAGES, COVERAGES, COVERAGE A- BUILDING PROPERTY, except for wood fences.

We will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure.

***

Form FE-5273 (8/00).

32.      "Section 1-CONDITIONS" of the Original Policy provides as follows:

8.      Loss Payment.  We will adjust all losses with you.  We will pay you unless some other person is named in the policy or is legally entitled to

12

receive payment. Loss will be *payable* 60 days after we receive your *proof of loss* and;

a.   reach agreement with you;
b.   there is an entry of a final judgment; or
c.   there is a filing of an appraisal award with us.

(Original Policy, p. 14) (emphasis added).

33.   On 25, 2004, State Farm sent a written demand for an appraisal. State Farm designated Ron Kohler as its appraiser. Plaintiffs believe Mr. Kohler has been State Farm's designated appraiser in other similar cases of hail damage to dwellings.

34.   By letter dated November 12, 2004, Plaintiffs agreed to participate in the appraisal process subject to certain reservation of rights, remedies and defenses.

35.   State Farm's appraiser, Ron Kohler, issued a loss estimate on April 27, 2005, with regard to the May 8, 2003 hail-storm loss to Mr. and Mrs. Rios that reflects the following:

Replacement Cost          $2,040.00

Depreciation              $673.20

Actual Cash Value         $1,366.80

Plaintiffs received the terms of the appraisal on or about July 21, 2005.

36.   The terms of the Endorsement do not permit State Farm to estimate or pay losses that deduct "Depreciation" or that make payment on an "Actual Cash Value" basis.

37.   The terms of the Policy also do not permit State Farm to use the appraisal process to abrogate coverage, including but not limited to the Endorsement and the "Option OL" benefits. State Farm's appraisal above does both, and may violate other Policy provisions as well.

13

38. The above "appraisal amounts" have not been paid by State Farm to Mr. and Mrs. Rios.

39. During periods relevant to this lawsuit, State Farm suffered serious and sustained financial losses through its property and casualty homeowner's insurance business and took affirmative, substantial steps to reduce or reverse those losses.

40. Upon information and belief, State Farm, by segregating the "replacement cost value" loss as reflected in this First Amendment to Class Action Petition, sought to essentially continue the coverage and claims practices under the Original Policy and apply those coverage and claims practices to the Endorsement, even though the Loss Settlement language was different and coverage was touted to Endorsement policyholders by State Farm as true "replacement cost value" coverage.

41. When State Farm engaged in the practice of segregating the loss as reflected in this First Amendment to Class Action Petition, State Farm intentionally created confusing and misleading circumstances about its coverage terms and claims practices, all with the design of reducing claims payments and financially benefiting State Farm, and thereby underpaying the policyholders for their losses.

42. Plaintiffs have not included materials discovered in documents produced and deposition testimony taken to date due to the arguable current application of a Protective Order. State Farm is also on notice to preserve documents nationally that relate to this lawsuit.

## CLASS ACTION ALLEGATIONS

43. Plaintiffs bring this case for their individual claims as well as in the form of a representative action, pursuant to Iowa Rule of Civil Procedure 1.261 et. seq., on

behalf of the "opt out" classes of all citizens of the any State of the United States of America who were or are State Farm homeowner's insurance policyholders:

> **Class I:** State Farm policyholders under Form FE-5273 (replacement cost endorsement) (and/or any other policy or endorsement with substantially similar loss settlement language) who did not have a first party dwelling structural loss covered claim in any State within the United States of America, but paid premiums (or inflated premiums) for "replacement cost" coverage that State Farm never intended and did not provide (the "**Wrongful Premium Class**"); and

> **Class II:** State Farm policyholders under Form FE-5273 (replacement cost endorsement) (and/or any other policy or endorsement with substantially similar loss settlement language) who had a first party dwelling structural loss covered claim in any State within the United States of America, where State Farm divided the replacement cost and withheld a portion of the replacement cost as "Depreciation", "Payable When Incurred" or an "incurred item", and State Farm retained all or part of the "Depreciation", Payable When Incurred or "incurred item" portion of the replacement cost. Excluded from this class are policyholders asserting a first party dwelling structural loss caused by fire and/or those where State Farm finally denied and/or disputed coverage (the "**Wrongfully Withheld Replacement Cost Class**").

The "Class Period" for all of the classes is from August 27, 1994 to the present.

    44.    Plaintiffs believe that many other former and current State Farm homeowner's policyholders will properly be included in one or both of the above-described classes. Therefore, the members of the classes would be so numerous that joinder of all members will be impracticable and/or impossible.

    45.    The claims of plaintiffs are typical of the claims of the other members of the classes because plaintiffs, like the other members of the classes:

    (a)    paid State Farm premiums for replacement cost value coverage, but did not receive it;

    (b)    suffered a covered structural dwelling loss to their dwelling on or after August 27, 1994;

(c)     were subject to the Endorsement at the time of any first party structural dwelling loss claim;

(d)     received from State Farm a check for an amount which did not include the D/PWI portion of the loss, and but only some other amount (which may or may not have been designated "Actual Cash Value") LESS the deductible; and

(e)     paid inflated or wrongfully charged premiums for Endorsement coverage which was not implemented as true "replacement cost value" coverage (and was never intended to be by State Farm) but should have been.

46.     Plaintiffs will fairly and adequately protect the interests of the members of the above-described classes.  Plaintiffs have retained counsel competent and experienced in complex, class action litigation.

47.     With respect to the classes, common questions of fact exist as to all members of the above-described classes and those common questions predominate over any questions solely affecting individual members of such classes.  Among the questions of fact that are common to plaintiffs and the other members of the above-described classes are, without limitation, the following:

(a)     whether "replacement cost value" coupled with the rest of the Original Policy and Endorsement, is ambiguous;

(b)     whether State Farm can pay under the policies less than replacement cost value under the excuse of D/PWI or like reason;

(c)     whether State Farm intended to pay less than replacement cost value when the Policies were issued;

(d)     whether Plaintiffs were damaged at all by the policies and practices of State Farm in underpaying the replacement cost value by the D/PWI portion;

(e)     whether putative class members paid inflated or wrongfully charged premiums for Endorsement coverage which was not implemented as true "replacement cost value" coverage (and was never intended to be by State Farm) but should have been;

(f)     whether State Farm's acts alleged in this First Amendment to Class Action Petition were "intentional" or in "reckless disregard"; and

(g)     whether the putative class members suffered damages which were caused by State Farm in terms of underpaid replacement cost value covered losses and/or wrongfully collected premiums or inflated premiums.

48.     With respect to the classes, common questions of law exist as to all members of the above-described classes and those common questions predominate over any questions solely affecting individual members of such classes. Among the questions of law that are common to plaintiffs and the other members of the above-described classes are, without limitation, the following:

(a)     whether State Farm's conduct was a breach of contract;

(b)     whether State Farm's conduct was in bad faith;

(c)     whether State Farm was unjustly enriched by its conduct; and

(d)     whether State Farm committed fraud in the inducement.

49.     Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the above-described classes. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently and without

duplication of time, expense and effort on the part of those individuals and/or State Farm. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all class members.

50.     Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by the members of the above-described classes because joinder of all members of those classes would be either highly impracticable or impossible and because the amounts at stake for individual class members, while significant, are not great enough to enable them to enlist the assistance of competent legal counsel to pursue their claims individually.

51.     In the absence of a class action in this matter, State Farm will likely retain the benefit of their wrongdoing and will continue the behavior set forth in this First Amendment to Class Action Petition.

### Count I of Division II—Breach of Express Contract

52.     Plaintiffs incorporate by this reference the allegations contained in the preceding and succeeding paragraphs of this First Amendment to Class Action Petition.

53.     At the time the respective contracts were entered into, the parties were capable of contracting.

54.     Plaintiffs and State Farm entered into a written and fully executed Policy.

55.     At all material times, plaintiffs have performed their terms and obligations under the Policy.

56.   Upon information and belief, the Rios Policy was executed and performed, in whole or in part, in the State of Iowa.

57.   State Farm intentionally and knowingly breached the Policy by its actions and/or inactions, including but not limited to:

(a)   Encouraging and training supervisory personnel and claims personnel to misrepresent information and mislead policyholders about the nature, propriety and extent of the basis for State Farm's Endorsement coverage, claims practices, loss estimates and loss payments;

(b)   Misrepresenting to policyholders the nature and extent of the basis for State Farm's Endorsement coverage, claims practices, loss estimates and loss payments;

(c)   Knowingly relying solely upon self-interested financial considerations and not the rights of policyholders to the full benefits under the Endorsement;

(d)   Paying policyholders less than the actual replacement cost value of the loss as a matter of practice and policy; and

(e)   Collecting fraudulently induced premiums and/or inflated premiums.

58.   As a result of State Farm's breaches, plaintiffs have been damaged through underpayment of the actual replacement cost value at the time of the loss, as well as any payment of premiums or overpayment of premiums.

59.     State Farm knew or had reason to know (and intended the corresponding consequences thereby) that the damages suffered would occur in Iowa and all other respective States.

60.     State Farm's wrongful acts directed at plaintiffs were intentional and malicious and/or were otherwise willful, wanton and in reckless disregard for the rights and interests of others and warrant the imposition of punitive damages against the State Farm, and amount to an independent tort.

### Count II of Division II – First Party Bad Faith

61.     Plaintiffs incorporate by this reference the allegations contained in the preceding and succeeding paragraphs of this First Amendment to Class Action Petition.

62.     State Farm was aware of the practice of under-compensating policyholders with first party property loss claims and fraudulently induced premium payments or inflated premiums.

63.     At all times relevant to this lawsuit, there has been no reasonable basis for State Farm to misrepresent information and mislead policyholders about the nature and extent of the Endorsement coverage and the basis for their loss payments.

64.     At all times relevant to this lawsuit, State Farm knew or had reason to know that there was no reasonable basis for the segregation and withholding of loss payments to the policyholders and/or the charge for premiums or inflated premiums.

65.     At all times relevant to this lawsuit, State Farm's bad faith acts included, but are not limited to:

      (a)     Encouraging and training supervisory personnel and claims

personnel to misrepresent information and mislead policyholders about the nature and extent of the basis for State Farm's Endorsement coverage, claims practices, loss estimates and loss payments;

(b)     Misrepresenting to policyholders the nature and extent of the basis for State Farm's Endorsement coverage, claims practices, loss estimates and loss payments;

(c)     Knowingly relying solely upon self-interested financial considerations and not the rights of policyholders to the full benefits under the Endorsement;

(d)     Paying policyholders less than the actual replacement cost value of the loss, as a matter of practice and policy; and

(e)     Collecting fraudulently induced premiums and/or inflated premiums.

66.     Plaintiffs have been damaged by State Farm's actions.

67.     State Farm acted with willful, wanton and reckless disregard of plaintiffs' rights by misrepresenting to policyholders the nature and extent of the Endorsement coverage and the basis for State Farm's claim's practices, loss payments and premium charges.

## Count III of Division II—Fraudulent Misrepresentation

### and Fraudulent Inducement

68.     Plaintiffs incorporate by this reference the allegations contained in the preceding and succeeding paragraphs of this First Amendment to Class Action Petition.

69.     State Farm was aware of the following facts:

21

(a)     Encouraging and training supervisory personnel and claims personnel to misrepresent information and mislead policyholders about the nature, propriety and extent of the basis for State Farm's Endorsement coverage, claims practices, loss estimates and loss payments;

(b)     Misrepresenting to policyholders the nature and extent of the basis for State Farm's Endorsement coverage, claims practices, loss estimates and loss payments;

(c)     Knowingly relying solely upon self-interested financial considerations and not the rights of policyholders to the full benefits under the Endorsement;

(d)     Paying policyholders less than the actual replacement cost value of the loss as a matter of practice and policy; and

(e)     Collecting fraudulently induced premiums and/or inflated premiums.

70.     State Farm intended that its policyholders receive less than the replacement cost value of the loss.

71.     State Farm concealed, failed to disclose or misrepresented the true facts with respect to all of the above.

72.     The undisclosed or misrepresented information was material to the transaction.

73.     State Farm knowingly failed to make the disclosures and/or made the misrepresentations.

74.     State Farm intended to deceive its policyholders by withholding such information or misrepresenting such information.

75.     Plaintiffs acted in reliance upon State Farm's misrepresentations and/or failures to disclose and were justified in such reliance, as State Farm expected them to do.

76.     State Farm's failure to disclose and/or misrepresentations were a proximate cause of plaintiffs' damages.

77.     State Farm's fraud caused damages and injury to policyholders through underpayment of losses and wrongful payment of premiums and/or inflated premiums.

78.     State Farm's wrongful acts directed at policyholders were intentional and malicious and/or were otherwise willful, wanton, reckless and in disregard for the rights and interests of others, and warrant the imposition of punitive damages against State Farm.

### Count IV of Division II—Unjust Enrichment

79.     Plaintiffs incorporate by this reference all of the allegations of the preceding and succeeding paragraphs contained in this First Amendment to Class Action Petition.

80.     Upon information and belief, State Farm received or retained monies from fraudulently inducing plaintiffs to accept less than the replacement cost value of the loss, as well as homeowner's insurance premiums (or inflated premiums) that did not reflect the actual coverage, loss evaluation and claims adjustment procedures permitted under the Endorsement coverage.

81.    Upon information and belief, the existence and ongoing retention of these monies by State Farm affected an immediate and measurable increase in State Farm's profits or revenues.

82.    State Farm's retention of such monies is unjust and unwarranted for all of the reasons set forth for this First Amendment to Class Action Petition and damaged plaintiffs.

83.    Plaintiffs seek an accounting of such monies and a disgorgement of such profits and monies.

84.    State Farm's wrongful acts directed at plaintiffs were intentional and malicious and/or were otherwise willful, wanton and in reckless disregard for the rights and interests of others, and warrant the imposition of punitive damages against State Farm.

## FRAUDULENT CONCEALMENT, LACK OF DISCOVERY, ESTOPPEL GENERALLY, ESTOPPEL DUE TO ILLEGAL ACTIVITY AND WAIVER OR ESTOPPEL DUE TO APPRAISAL AND/OR CONDUCT

85.    Plaintiffs incorporate by this reference the allegations contained in the preceding and succeeding paragraphs of this First Amendment to Class Action Petition.

86.    Through its representations in its loss estimates and other related claims practices (in addition to those in State Farm's homeowner's policy, renewal and related documents), State Farm misrepresented to its Endorsement policyholders that the policyholder was receiving proper coverage practices and properly calculated loss payments, when in fact the insured was receiving something less based upon withholding certain categories of replacement cost value loss.

87.     State Farm secretly carried out its scheme to underpay Endorsement policyholders an amount less than the full replacement cost value of the loss and charged premiums (and/or inflated premiums) for Endorsement coverage State Farm never intended to deliver.

88.     Because of State Farm's active misrepresentations, subsequent omissions and general scheme to conceal its underpayment of the full replacement cost value as well as charging premiums (and/or inflated premiums) for Endorsement coverage that State Farm never intended to deliver, plaintiffs did not become aware, and could not have become aware through the exercise of reasonable diligence, that such schemes were in existence.

89.     Plaintiffs were not aware of State Farm's schemes and relied upon State Farm's schemes which is what State Farm intended. Therefore, plaintiffs are entitled to toll the applicable statutes of limitations, whether contractual, statutory or common law, based upon the doctrines of fraudulent concealment and estoppel, as well as lack of discovery.

90.     State Farm engaged in illegal insurance schemes, as reflected above, which estopps State Farm from asserting or relying upon any contractual, statutory or common law statute of limitations.

91.     State Farm otherwise initiated the appraisal process, engaged in settlement negotiations and other illegal, misleading and inequitable conduct which constitutes waiver or creates estoppel of any contractual, statutory or common law statute of limitations.

**PRAYER FOR RELIEF**

**THEREFORE,** plaintiffs respectfully request that the Court enter a judgment in favor of plaintiffs and against State Farm, for the damage plaintiffs have suffered as a result of the State Farm's actions, including court costs and expenses, the amount of the wrongfully withheld "Payable When Incurred", "incurred items" and/or "Depreciation", wrongfully charged or inflated premiums, *pro rata* punitive damages, interest and attorney's fees and grant plaintiffs such other and further relief as the Court deems just.

## JURY DEMAND

Plaintiffs demand trial by jury regarding all issues that can be tried to a jury under applicable law.

DATED:        July 28, 2005

                              Respectfully submitted,


                              Joseph R. Gunderson, Esq.
                              GUNDERSON, SHARP & WALKE, L.L.P.
                              317 Sixth Avenue, Suite 300
                              Des Moines, Iowa 50309
                              Telephone: (515) 288-0219
                              Facsimile: (515) 288-0219
                              E-mail: jgunderson@midwest-law.com

                              Mr. Jeff Bittner, Esq.
                              125 Kirkwood Blvd.
                              Davenport, Iowa 52803
                              Telephone: (563) 323-7007
                              Facsimile: (563) 323-8335
                              E-mail: jbittner@kirkwoodlaw.com

                         ATTORNEYS FOR PLAINTIFFS

                        CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties in the
above cause by emailing a copy thereof directed to each of the attorneys of record herein
at their respective email addresses disclosed on the pleadings as follows:

                         J. Michael Weston, Esq.
                          James P. Craig, Esq.
                          2720 First Avenue NE
                            P. O. Box 1943
                       Cedar Rapids, IA  52406-1943
                        Telephone:  (319) 366-7331
                           Fax:  (319) 366-3668
                     E-mail: mweston@moyerbergman.com
                      E-mail: jcraig@moyerbergman.com

                       Joseph A. Cancila, Jr., Esq.
                         James P. Gaughan, Esq.
                       Lawrence H. Heftman, Esq.
                           Schiff Hardin LLP
                           6600 Sears Tower
                           Chicago, IL 60606

Telephone (312) 258-5500
Fax (312) 258-5600
Email: jcancila@schiffhardin.com

*ATTORNEYS FOR STATE FARM FIRE
AND CASUALTY COMPANY*

Dated at Des Moines, Iowa this 28ᵗʰ day of July, 2005.